Roth v. Continental Wire Co.

CHARLES A. ROTH, Respondent, v. THE CON-
TINENTAL WIRE COMPANY, Appellant.

St. Louis Court of Appeals, April 29, 1902.

1. **Assignment of Claim**: A PRIMA FACIE ASSIGNMENT BY A
CORPORATION. The fact that the assignment of the claim was
executed by the president and by the secretary attested by the seal
of the company, furnished prima facie evidence that the assignment
was the act of the corporation.

2. ———— ABSOLUTE ON ITS FACE BINDING: QUESTION OF
CONSIDERATION IMMATERIAL TO THIRD PARTY. The as-
signment being absolute on its face, it was immaterial so far as ap-
pellant was concerned, whether the assignment was for a valid con-
sideration or for no consideration, and was sufficient to authorize
action by the assignee, though the Practice Act requires actions to
be instituted by the real party in interest.

3. **Sale**: DELIVERY, CONSTRUCTIVE, SUFFICIENT: PROOF OF
SAME ADMISSIBLE. When both parties understood that certain
machinery was ready for actual delivery, and the only reason why
an actual delivery of it had not been made was because the pur-
chaser had not signified that he was ready to receive it, it is proper
to show, in an action for the purchase price, that constructive de-
livery had been made within the period fixed by the contract.

4. **Evidence**: DECLARATIONS: DEPOSITIONS. Declarations of a
witness with respect to the subject-matter of a suit, may be admis-
sible as original evidence in the case, and the fact that they con-
tradict a deposition afterwards given by such witness, will not de-
stroy their admissibility as evidence.

5. **Referee's Report**: FINDINGS OF REFEREE: TRIAL AND AP-
PELLATE COURT'S ACTION THEREON. In a compulsory ref-
erence case at law, the trial court may review the findings of the
referee and make findings of its own, and in equity cases the appel-
late court may also review the evidence and make its own findings,
and is not bound by the findings of either the referee or of the chan-
cellor.

6. ————: COMPULSORY REFERENCE: APPELLATE PRACTICE.
In cases of compulsory reference, where all the testimony is before
the court, with the findings of the referee, and the trial court's ac-
tion thereon, the appellate court may approve, reverse or modify

such findings of the referee, but to authorize such action, the evidence should be clear and convincing that the findings were the result of mistake or clearly against the weight of the evidence.

7. **Sale of Machines: SUIT FOR PURCHASE PRICE: WARRANTY, BREACH OF: BURDEN OF PROOF ON SELLER.** Where the contract requires the machines sold to be as good or better, and work as well or better, than the sample machine, and defendants plead a breach of such warranty, that the machines furnished were not as good and would not work as well as the sample machine, the burden is on the party suing for the purchase price of machines sold, to show that they were as good as the sample.

8. ——: ——: **PRIMA FACIE CASE MADE BY THE PROOF.** In a suit for the purchase price of machines sold by sample, evidence showing that the machines sold were made according to the same pattern, from the same materials, in the same shop, and by the same men, makes a prima facie case, that the machines correspond to the sample.

9. ——: ——: **DEFENSE, BREACH OF WARRANTY: BURDEN OF PROOF ON PURCHASER.** If the purchaser defends a suit for the purchase price for certain machines sold by sample, that they were not as warranted, the burden of proof is on the party buying to prove that the machines were not as good and did not work as well as the sample.

10. ——: ——: **BREACH OF WARRANTY PROVED: DAMAGES.** Machines sold by sample, with the promise that they would be as good and do as good work, and the purchaser was satisfied when they were delivered that they were as near like the sample machine as ordinary care and skill could make them, yet, nevertheless, it being clear from the evidence, that the machines utterly failed to perform the work which the sample machine had performed, there was a breach of the tool company's warranty, and damages therefor should have been allowed by the referee.

11. ——: ——: ——: **MEASURE OF DAMAGES.** If the machines were of no value for making nails, as the evidence tends to show, then the appellant is entitled to recoup the difference between the contract price and the value of the machines for some other purpose.

Appeal from St. Louis City Circuit Court.—*Hon. Franklin Ferris,* Judge.

REVERSED AND REMANDED (*with directions*).

*Gilliam & Smith* for appellant.

(1)   The referee erred in excluding evidence offered to show that Charles A. Roth paid nothing for the assignments of claims sued on, and was not the real party in interest, and the court erred in adopting his rulings.   Nanson v. Jacob, 93 Mo. 331; Williams v. Whitlock, 14 Mo. 553; R. S. 1889, sec. 1990; R. S. 1899, sec. 540; Wonderly v. Lafayette Co., 150 Mo. 635; Roberts v. Abner, 42 S. W. 337; Perry v. Liter, 37 Mo. 274; Bidwell v. Dock Co., 40 Mo. 42; Bigler v. Flickinger, 55 Pa. St. 284; Kollock v. Gunnert, 43 Mo. App. 566; Musser v. Adler, 86 Mo. 445; Thomas v. Ramsey, 47 Mo. App. 84; Hoffman v. Parry, 23 Mo. App. 20; Bond v. Long, 87 Mo. 266; Plano Mfg. Co. v. Cunningham, 73 Mo. App. 376; Kelly v. Thuey, 143 Mo. 422; R. S. 1899, sec. 746; R. S. 1889, sec. 2186; Young v. Glasscock, 79 Mo. 577; Greenway v. James, 34 Mo. 328; Northrup v. Ins. Co., 47 Mo. 44.   (2)   The referee's findings were against the weight of the evidence, and the court erred in sustaining his findings, and this being a compulsory reference, and involving the examination of a long account on the plaintiff's part, and a great many counterclaims on defendant's part, the court will examine and weigh the evidence and determine its own conclusions, and if the referee found against the weight of the evidence this court will make the correction.   State ex rel. v. Hurlstone, 92 Mo. 327; Wentzville Tobacco Co. v. Walker, 123 Mo. 671; Small v. Hatch, 151 Mo. 306; Williams v. Railway, 153 Mo. 495.   (3)   If defendants were at all liable for any alleged interferences by Henry Fuchs (a charge and an interference in no way conceded), the action by Fuchs, if any, made a *nudum pactum;* there was no consideration for any change; no such changes were pleaded; no waivers were pleaded; but plaintiff claimed performance pure and simple, and could not recover on any other ground.   Larsen v. Railway, 110 Mo. 253; Waldheir v. Railroad, 71 Mo. 514; Reed v. Bott, 100 Mo. 62; Nichols v. Larkin, 79 Mo. 264.

*Ed. L. Gottschalk* for respondent.

(1)   The assignments being in writing, plaintiff was the real party in interest and could sue in his own name. Guerney v. Moore, 131 Mo. 668; State (ex rel.) v. Shelby, 75 Mo. 485; Simmons v. Belt, 35 Mo. 461; Doering v. Kenamore, 86 Mo. 588; Long v. Heinrich, 46 Mo. 603; Walker v. Mauro, 18 Mo. 564; Amer. Smelt. Co. v. Fire Assur. Co., 71 Mo. App. 661.   (2)   It is no defense that the payee and holder of a note is trustee for a third party.   Nicolay v. Fritschle, 40 Mo. 67.   If a cause of action is assigned (to pay over proceeds to assignor), the assignee is a trustee of express trust and must sue in his own name.   Dean v. Chandler, 44 Mo. App. 338.   (3)   The machines being ready for delivery and plaintiff being requested to retain them until further order, was a constructive delivery and not a waiver.   Tiedeman on Sales, sec. 104.   (4)   If the parties have not selected or designated a place for delivery of the goods in the performance of a contract of sale, the goods must be held ready for delivery at the place where they were at the time of sale. Tiedeman on Sales, sec. 96; Kraft v. Hurtz, 11 Mo. 109. (5)   The referee's findings are, in an action at law, conclusive as to the facts.   Lingenfelder v. Wainwright Bry. Co., 103 Mo. 578.   (6)   They are to be treated on appeal as a special verdict, and will not be disturbed if there is any evidence to establish the facts found.   Howard Co. v. Baker, 119 Mo. 397; Berthold v. O'Hara, 121 Mo. 88; Darling v. Potts, 118 Mo. 506.

BLAND, P. J.—On September 1, 1896, the B. Roth Tool Company, a corporation doing business in the city of St. Louis, and the Continental Wire Company, a corporation doing business in Granite City, in the State of Illinois, entered into the following contract:

"St. Louis, Mo., Sept. 1, 1896.

"For and in consideration of the sum of fifty dollars, to it in hand paid, the receipt of which is hereby acknowledged and the further consideration of the agreements hereinafter stated, the B. Roth Tool Company hereby sells to the Continental Wire Company the option to purchase twenty-five wire-nail machines designated as follows: Two A machines, three B machines, nine C machines, nine D machines, one E machine, one F machine, of the kind and as described in the catalogue of the P. & B. Nail Machine Company, of St. Louis, a copy of which catalogue containing said description is hereto attached, and referred to as a part of this contract so far as said description is concerned, at and for the price of nine thousand, two hundred and fifty dollars, to be paid as hereinafter stated; all of said machines so sold by said B. Roth Tool Company to be double-headed, and to have all the improvements designed by Henry Fuchs, the said B. Roth Tool Company being the owner in its own right of the said P. & B. wire-nail machines, and also of the improvements aforesaid. The said Continental Wire Company is to close this option on or before the eighth day of September, 1896, and notify the B. Roth Tool Company, in writing, to deliver said machines. Upon receipt of said notice the said B. Roth Tool Company shall deliver three of said machines to said Continental Wire Company and shall not receive pay therefor until the whole of said twenty-five machines are delivered. That including the said three machines the said B. Roth Tool Company shall deliver eight machines within two weeks from the date of said notice to close this option and the Continental Wire Company shall pay for the same as delivered. That said B. Roth Tool Company shall deliver within six weeks from the date of notice, the remaining seventeen of said machines, and shall receive the said sum of nine thousand, two hundred and fifty dollars for all of said twenty-five machines, but in the event the said B. Roth Tool Com-

pany shall fail to deliver said machines within six weeks, then they shall only receive in all the sum of eight thousand, five hundred dollars.

"In consideration of the premises and the mutual agreements of the parties, the B. Roth Tool Company agrees to sell and deliver seventy-five additional machines on the order and at the option of the Continental Wire Company, and of the kinds they may order within one year after the delivery of the last of the twenty-five machines first herein mentioned, for which said Continental Wire Company is to pay at the same rates proportionately as is herein agreed to be paid by them for the said first twenty-five machines upon the delivery thereof.

"In consideration of the premises and of the agreements herein, and in consideration that the B. Roth Tool Company will not sell to any person, corporation or company, except the Continental Wire Company, any of said machines, the said last-named company will pay to said B. Roth Tool Company the sum of one cent a keg for each and every keg of nails manufactured by said machines during the option of said Continental Wire Company; it being understood that if said Continental Wire Company shall fail to pay said royalty of one cent a keg by the tenth of each month for the nails manufactured in the preceding month, then said B. Roth Tool Company may sell machines to anyone who may wish to buy.

"It is further understood that if any patents are granted by the United States on said machine or improvements, that the said Continental Wire Company shall have the exclusive right to use said machines in the United States under said patents so long as it shall pay said royalty of one cent a keg for all nails manufactured by said machines as hereinbefore stated.

"It is further understood that the B. Roth Tool Company

guarantees that neither said P. & B. nail machines nor said improvements by Henry Fuchs infringe on any patents held by others, and that the said Continental Wire Company shall have the exclusive use of all patents that said B. Roth Tool Company has or may have under this agreement, or that may be hereafter taken out by said H. Fuchs; and said B. Roth Tool Company guarantees that all of said machines shall be perfect in all their parts and will do the work for which they are intended, to the satisfaction of the said Continental Wire Company.

"It is further agreed that in the event the said B. Roth Tool Company shall fail to carry out this contract if the same is demanded by the Continental Wire Company, then it shall pay to the said Continental Wire Company the sum of five thousand dollars as liquidated and ascertained damages and not as a penalty, but this shall not apply to the failure to deliver the machines within the time limited herein if the same are delivered within a reasonable time thereafter.

"In witness whereof the said B. Roth Tool Company has caused this contract to be signed by its president, William Boefer, and attested by its secretary, Edward B. Roth, under the seal of said company, and the said Continental Wire Company has caused this contract to be signed by its president, D. R. Wolfe, and attested by its secretary, William E. Ware, under the seal of said company on the 1st day of September, 1896."

On September 7, 1896, the parties made the following supplementary agreement:

"For and in consideration of the sum of twenty-five dollars, this day paid to the B. Roth Tool Company by the Continental Wire Company, the receipt of which is hereby acknowledged, the option sold to the Continental Wire Company by the B. Roth Tool Company, September 1, 1896, is hereby extended to the nineteenth day of September, 1896. The main object in having this option extended is to give the

parties time to test the machine. In the event that the C machine now being tested proves satisfactory to the Continental Wire Company and the option is closed by its order for the first twenty-five machines mentioned in the said contract of September 1, 1896, then the following form of order shall be given to the B. Roth Tool Company by the Continental Wire Company, to-wit:

"B. Roth Tool Company:—You are hereby notified that we close the option sold to us by you in the contract of September 1, 1896, and hereby order the first twenty-five machines as stipulated in said contract, all to be built of the best material and workmanship and to be as good or better in all respects as the C machine on which the tests were made and all to work as well or better than the said machine on which the tests were made.

"Upon delivery thereof as stipulated in said contract we will pay therefor as in said contract provided.

"In witness whereof the said B. Roth Tool Company and the said Continental Wire Company have caused this extension to be signed by their respective presidents and attested by the seals of said corporations on the day and year first written."

Within the time limited by the contract of September seventh, the Wire Company gave the order in the form agreed upon on September seventh, for twenty-five nail machines and afterwards gave an order for five additional machines, both of which orders were filled.

The tool company performed some labor for furnishing to the wire company some tools and machinery.

The first count of the petition is to recover an alleged balance on account of the first twenty-five machines. The second count is to recover the purchase price of the five additional machines. The third count is for the recovery of the royalty of one cent per keg of nails made by the wire company

on the machines.    The fourth count is for material and tools furnished and for labor performed.

The answer is a general denial as to all the counts.    It pleaded a reduction of seven hundred and fifty dollars on the price of the first twenty-five machines, on the ground that they were not furnished within the time agreed upon, and pleaded payment and counterclaims on the first and second counts on account of alleged defects in the machines and for breach of warranties of the contract, and alleged that only eighty-five hundred and eight kegs of nails had been made, and pleaded payment of eighty-five dollars and eight cents in discharge of the third count; pleaded payment of two hundred and eight dollars and forty cents on the fourth count and alleged that all the other items were for material and labor of the tool company in trying to make the machines comply with their contract obligations.

The answer also specifically alleged that the plaintiff was not the real party in interest, but that the B. Roth Tool Company was the real party in interest.

There was a compulsory reference of the case and Arba N. Crane, Esq., was appointed by the court as referee.

The referee heard the evidence and made the following report:

"THE FACTS STATED AND CONSIDERED.

"It appears that the defendant being already engaged in conducting a wire factory determined to add to its business the manufacture of nails.    With this apparent purpose Mr. D. R. Wolfe, president of defendant company, on the last of August, 1896, called on Edward B. Roth, secretary and manager of the B. Roth Tool Company, to arrange for the purchase of some nail machines.    Upon the assurance of Roth that his company could furnish the machines, a meeting was appointed for the following morning at the office of the de-

fendant in the city of St. Louis to effect a contract for the machines.

"This meeting took place as appointed. There were present Wolfe, said E. B. Roth, Rowe, secretary of the defendant, Henry Fuchs, and perhaps one or two others connected with the defendant.

"The entire day was spent in negotiations which resulted in the contract (Exhibit A to the petition in this case). This contract is dated September 1, 1896, and is an option to continue until September 8, 1896, granted by the tool company to the defendant to purchase twenty-five nail machines, of various specified sizes, for the gross sum of $9,250, with the privilege of more at the same rate. The body of the contract provides that the machines shall be double-headers, and are guaranteed by the tool company to be perfect in all their parts and do the work for which they are intended to the satisfaction of the defendant. And by reference, the machines were also to be of the kind described in the printed catalogue of the P. & B. Nail Machine Company, a copy of which catalogue is attached and referred to as part of the contract, so far as said description is concerned. But it is expressly required that the machines shall have all the improvements designed by Henry Fuchs.

"The contract does not specify these improvements but states that they, as also the P. & B. nail machine, are the property of the B. Roth Tool Company.

"Shortly after the contract was signed a machine which the tool company had fitted up was removed to Graf's shop, 3205 North Broadway, St. Louis. This was done at the instance of the defendant for the purpose of testing the machine at a neutral or at least a less public place than at Roth's. After a few days' trial the defendant applied to the tool company for an extension of the option to enable it to make a thorough test of the machine, and by a written agreement dated September 7, 1896, the option was extended to Sep-

tember 19, 1896. By this agreement it was also provided that if the test proved satisfactory to the defendant, its order for the first twenty-five machines should be conditioned that they should be as good or better in all respects and work as well as the machine tested, and built of the best material and workmanship. This extension agreement is the Exhibit B to the petition. In the meantime some parts (a pulley, Roth says) of this test machine broke. Roth explains that the equipment of this machine was not thorough, but temporary in some respects; and that another machine, better constructed, having Fuchs' rocker added, was sent to Graf's shop to be tested by the defendant.

"The result of the test of this second machine was that the defendant ordered of the tool company the twenty-five machines. This order is dated September 19, 1896, and is in evidence. In terms it follows the form prescribed in the agreement of September 7. The tool company complied with this order by delivering twenty-five nail machines, which were taken to the factory of the defendant at Granite City, Illinois.

"Some of these machines were not received by the defendant within six weeks after the date of the order, the period prescribed by the contract for the complete delivery of the twenty-five machines under a penalty of $750. But this delay was at the request of the defendant.

"A question is made whether under the pleadings the plaintiff can show this request for delay. I will hereafter notice this question. On November 6, 1896, the defendant further availed itself of the option by ordering of the tool company five additional machines. The written order is in evidence. Among other things it states, 'payment to be made as soon as they are complete and thoroughly adjusted. All of the machines to be of the best material and workmanship.'

"The tool company accepted this order and furnished the defendant five nail machines. It is admitted that at the rate

agreed upon in the original option contract the price of these five machines is $1,545.89.

"I consider it to be conceded that the defendant has paid only $8,871.35 to the tool company. As these payments do not cover the contract price for the machines delivered, the defendant is still indebted on that account unless its defenses here, that the tool company has not complied with its contract, ought to prevail. As presented to me, there are several questions involved in this inquiry. First. What did the tool company undertake by the contract of September 1? Second. What, if any, modifications in that undertaking were made by the subsequent contract of September 7?

"And having ascertained from these two contracts what the obligations of the tool company were, it remains to determine whether that company has performed those obligations or shown legal excuses for failure to so perform.

"*The Contract of September* 1, 1896.—The undertakings in question, of the tool company, by the first contract, are expressed as follows:

"(1) The machines to be 'of the kind as described in the catalogue of the P. & B. Nail Machine Company of St. Louis, a copy of which catalogue containing said description is hereto annexed and referred to as a part of this contract so far as said description is concerned.'

"(2) The machines 'to be double-headed and to have all the improvements designed by Henry Fuchs.'

"(3) 'The said B. Roth Tool Company guarantees that all of said machines shall be perfect in all their parts and will do.the work for which they are intended to the satisfaction of the said Continental Wire Company.'

"Interpreting these provisions without reference to the second contract, the question of the effect of the call for the P. &. B. catalogue, is not free from difficulty. In pleading, the defendant has counted on a number of representations contained in that catalogue, charging breaches on them on the

theory that they constitute distinct obligations of the tool company.

"On the hearing I did not deem it expedient to limit the defendant in its testimony offered on this theory, and considerable evidence was consequently received tending to show that the machine did not work at the factory of the defendant to its satisfaction, and failed in several particulars to fulfill the representations in the catalogue of the P. & B. machine. I now, however, conclude that this theory of the defendant as to the obligations of the tool company under the first contract is untenable.

"In the first place that, contract is not for a P. & B. machine, but for a machine of that description with all the improvements designed by Henry Fuchs. And it is shown that these improvements of Fuchs are substantial changes in the P. & B. machine both in parts and in principle. Again, the call for the catalogue is limited to description by its terms, which, I think, excludes the idea of any intention to incorporate into the contract the representations respecting the merits and performance, the equipment and capacity of the machines to be made. Moreover, that matter would seem to be covered by the express guaranty that the machines should be perfect in all their parts and do the work for which they were intended to the satisfaction of the defendant. These considerations lead me to conclude that the representations in the P. & B. catalogue did not impose any obligations on the tool company. Under the original contract, therefore, the obligation of the tool company was to furnish the defendant with nail machines of the design of the P. & B. machine, but having the improvements of Fuchs, and to be also perfect in all their parts and work to the satisfaction of the defendant.

"*The Effect of the Second Agreement.*—Coming now to the contract of September 7, extending the option of September 1 to the nineteenth of the same month, it is therein agreed

that if the machine tested proves satisfactory to the defendant, its order for the twenty-five machines, if given, shall be as follows:

"'B. Roth Tool Company: You are hereby notified that we close the option sold to us by you in the contract of September 1, 1896, and hereby order the first twenty-five machines as stipulated in said contract—all to be built of the best material and workmanship, and to be as good or better in all respects as the C.machine on which the tests were made, and all to work as well or better than the said machine on which the tests were made.'

"In considering the question whether the language just recited modifies the provisions in the original contract respecting the machines to be furnished, it is to be observed that in making the latter contract the parties had in contemplation certain ideas. They do not refer to any constructed machine at hand containing the identical thing intended by the agreement. Machines were to be furnished of a certain type having Fuchs' improvements and guaranteed by the builder to be perfect, and to do the work intended, to the satisfaction of the defendant. In other words, the first contract evidently contemplated a test of the machines after they were delivered. They were to do the work for which they were intended, a fact ascertainable only by operating the machines in the manufacture of nails.

"When the second contract was made the situation was different. A machine had then been furnished as a sample of what the tool company proposed to construct for the defendant. In place, therefore, of waiting until after the machines were delivered to give them a trial, it was now determined to make the test before the machines were constructed. But to give the sample machine a thorough test required more time than the original option would permit. Accordingly the second agreement was made by which the tool company agreed to extend the time for closing the option and the defendant

in effect agreed that if the sample machine, on being tested proved satisfactory and the twenty-five machines were ordered, the defendant would accept them if made of the best material and workmanship and were as good or better in all respects as the test machine and worked as well or better than that machine.

"I think that this new agreement defines the obligations of the tool company in respect of the quality and operative capacity of the machines to be delivered, and was intended as a substitute for the promises of the tool company, in that respect, contained in the contract of September 1.

"And, indeed, from the testimony of Mr. Wolfe it may be very properly concluded that the new agreement was intended to establish a standard satisfactory to the defendant for the machines contracted for, and to be delivered by the tool company.

"On page 78 of the record Wolfe testifies as follows: 'Question. And you did not want any other machine than exactly such a one as that was tested? Answer. That was what we expected to get.'

"This applies to the five machines as well as the twenty-five referred to in the second agreement.

"*Performance by the Tool Company.*—Now, the evidence as to the performance by the tool company of its contract to construct the machines of the best material and workmanship, and to make them as good or better than the test machine, as testified by the witnesses concerned in building the machines, is substantially all one way. It is that the material used and the workmanship done on the thirty machines delivered to the defendant, was first-class, and that they were made like the test machine only that they were made stronger, which all the witnesses agree made them better than the test machine.

"But the defendant attacks the construction of the machines. Thus, the testimony of Fitch, Farrell, Baum and

Roth v. Continental Wire Co.

other agents and employees of the Pittsburgh company, with which the defendant is connected, gives these machines the most worthless character. I have counted two dozen apparently vital defects which these witnesses point out, none, however, caused by any perceivable departure in construction from the machine.

I am satisfied that these alleged defects are exaggerated. The defendant had operated the machines for a considerable period before these Pittsburgh witnesses saw them. They are unlike other nail machines and essentially different from those which these witnesses had been accustomed to, and I think I notice a tendency to regard these differences as defects in the machines in question.

"Some of the defendant's witnesses have testified that these machines were not of uniform construction. Thus, Reid speaks of the shafts, and J. A. Farrell says that all of the machines were made a little different. There had been changes made in many of the machines after they were delivered and before these witnesses saw them, but the testimony of the machinists who constructed the machines is that those of the same class were made from the same patterns and were alike.

"They were cast in the same moulds and were bored, rimmed, turned and finished by the use of the same lathes and tools, operated on the same forms and the parts of each machine were interchangeable. And it is shown that in operation it was not unusual to replace a part which had become defective with a like part from another machine.

"I am satisfied that when the machines were delivered they were as near alike in construction as ordinary care and skill could make them.

"*Defendant Interferes.*—But there is no doubt whether the defendant ought to be heard to complain of defects in the machines, inasmuch as the evidence shows that the defendant interfered in their construction.

"It will have been already noticed that next to the par-

ties to the contract here, the most important actor is Henry Fuchs, whose improvements are called for by the contract.

"We have seen that he was present at the office of the defendant when the first contract was made. He was also present and participated in the test made at Graf's.

"He was not present on either occasion at the instance of the tool company, nor was he in the employ or connected with that company. There had been some previous dealings between them, and the tool company had acquired a right in his improvements on nail machines.

"Whether he was in the employ of the defendant prior to the contract of September 1, 1896, does not clearly appear, but he was concerned in putting up the two test machines, and was in its employ when the order for the twenty-five machines was given, and continued to serve the defendant until after the middle of the following December.

"According to Roth, when this order was given, Wolfe told Fuchs to see that the machines were made according to his ideas. This was before the tool company begun to fill the order. Wolfe himself says that after the test he had Henry Fuchs watch the construction and paid him a salary. It is certain that during a few weeks following that order, Fuchs was all the time at the Roth shop directing the work on the machines. When the first five of the machines were sent over to Granite City, Fuchs went with them to see to their adjustment and operation. But he paid frequent visits to Roth's to see that the rest of the machines were made as directed by him. Mehland says he came there every evening for that purpose. Grossman says that Fuchs changed the patterns and, 'if I wanted to know anything I asked Fuchs.' He made drawings from which Mehlan made the templets, and the machines were in fact constructed in conformity with his designs and ideas. Roth and his employees deferred to him throughout.

"Roth did not approve of some of these ideas—there were

differences, some of the witnesses say disputes—not about the improvements designed by Fuchs but about the way some of the parts should be constructed and attached, matters affecting the durability and operation of the machines rather than the principle of them.

"Fuchs himself recollects that Roth objected to set-screws instead of bolts in the spiders to hold the rockers to the wood springs—to solid instead of open pulleys—to the fly wheels. They also differed about the bushings. Roth and other witnesses give instances of other objections, overruled by Fuchs, who in all the differences with Roth had his own way.

"Later on, in operating the machines at the defendant's factory, it was found that Roth's ideas were the best, and in many instances, changes to them were made.

"Wolfe says that the defendant expected machines like that which was tested, and did not want Fuchs to add anything; that the object of having him at Roth's was to get the machines out in time. He was to see that the material was good. In another place Wolfe says that he supposed that Fuchs knew about the machine and would make it as complete as could be made, paid him to see that the machines were properly constructed. But Wolfe distinctly denies giving the directions to Fuchs about constructing the machines as testified to by the latter and by Roth.

"Fuchs says that after the test was made Sanderson told him that the order for the twenty-five machines had been given and that 'Mr. Wolfe wanted to see me.' 'I saw him and he said, 'Harry, now just go out to Roth's tool shop—the order has been given for the twenty-five machines—and you watch and see that the machines are built just the same as the one on Broadway, and better if possible, and anything that you can think of that would be a benefit to the machines, you have it put in, and see that the material is good.'

"Roth who was then present says that Wolfe said to Fuchs: 'Now, Harry, I have given the order for the ma-

chines—you go out to Roth's shop and see that the machines are built according to your ideas and make any improvement on them that you think advisable and see that the material is good. We want the best machine in the market if possible.'

"Viewing the evidence as a whole, I am convinced that the defendant intended that the ideas of Fuchs should prevail in the construction of the machines. In other words, Wolfe expected a better machine by the aid of Fuchs than the tool company would have otherwise furnished, and I conclude that he gave the directions to Fuchs as understood by both Fuchs and Roth, and acted upon by them.

"I think moreover that the action of Wolfe in this matter justified Roth in deferring to Fuchs; and I doubt whether the defendant ought to be heard to complain of the consequences.

"*Operation of the Machines.*—I conclude that the defendant has no just ground for complaint against the tool company respecting its contract to make the machines of the best material and workmanship and like the test machine.

"But there remains to be considered the additional promise of the tool company that the machines should work as well as the test machine.

"Whether these machines would have worked as well if operated under the same conditions as the test machine was at Graf's, can never be positively known. In operation at the defendant's factory, however, neither their running nor their output equaled that of the test machines at Graf's on Broadway. The defendant insists that this difference in operation shows that the machines were not constructed according to the contract. But it was stated on the hearing and is, I believe, no uncommon experience with machinery, that some machines will work well and others will not, though no difference in construction can be detected.

"I consider, however, that the promise of the tool company, as to the operation of the machines, is independent of

its promise as to their construction. And if the tool company stands excused for the failure of the machines to work as well as the test machine had done, it must be on the ground that the failure is to be attributed to the fault, neglect and mismanagement of the defendant; concerning all which there has been considerable evidence offered. I gather from this evidence that nail machines of every pattern are difficult to manage. They are of delicate construction, the parts are numerous and complicated and are easily disordered. The operation of them requires experience, intelligence, close attention and sobriety on the part of the operators. Besides this, the motive power must be adequate and the speed properly regulated. Then, too, the wire used must be suitable and there must be a sufficient equipment of tools, and supply of materials, ready at hand, for promptly correcting any irregularities in the parts, and repair or replace such as become defective from wear or accident. All of these conditions appear to be absolutely necessary to the successful and productive operation of these machines. The want of them, or any of them, is certain to cause delays and a diminished product, while the continued operation of a nail machine, after any of its parts become defective, or from any cause begins to run irregularly, is especially disastrous to the machine. It breaks down altogether. Now, Fuchs, who was in charge of the machines in question from the time that the first lot were delivered at Granite City, in October, until after the middle of December, says that the power furnished there was unsteady—generally speeding too fast—and that there was a lack of tools and materials for keeping the machines in proper condition for operation. In this he is supported by other witnesses. Fuchs, indeed, expressly states that the failure of the machines to accomplish what was expected of them was owing to the neglect of the defendant to provide suitable power and tools and materials—that the want of these things de-

feated his efforts to make the machines do good work. He says the fault was not in the machines.

"It would not be expected that Fuchs would readily admit that these machines, made under his direction, were defective, but the evidence does show that the defendant did not have the necessary tools and material ready at hand when it directed Fuchs to operate the machines, and that there was unreasonable delay in providing the requisite tools, steel, etc., in consequence of which the machines had to be, many of them, shut down.

"Indeed, the evidence of fault in the machines during the time that Fuchs was in charge, that is, a failure to work as double-headers, is rather as to the amount of the output than any insufficiency in the machines. Complaints in the latter respect seem to have begun after Fuchs left the employ of the defendant. He did, however, find it necessary himself to make some changes in the adaptation and attachment of some of the parts, following in some instances the ideas formerly urged upon him by Roth. But that the first machines during the time that Fuchs run them, were not considered by the defendant to be much in fault, may be inferred from the fact that in November the order was given for the additional machines.

"On or about December 23, Fuchs was discharged by the defendant. He was succeeded, one after another, by several foremen, who had been accustomed to machines of patterns different from these in question, and who evidently did not regard them with much favor.

"The immediate successor of Fuchs was Wendel, an experienced operator, who soon found what he considered faults in the machines and set about correcting them by making some changes. Among other things, he was not satisfied with the rocker designed by Fuchs, neither as to its operation for a double-header, nor as to the attachment of it to the machine. He, however, says that then, and now, he has always thought

that the machines could have been made to work well as double-headers.

"After about three weeks' service, and while he was trying to get the machines to work according to his ideas, Wendel was relieved and Leach, with other notions, took charge.

"Leach was one of several of the nail men brought on from the Pittsburg house. He tried his hand at reforming the machines. Says they would not operate as double-headers.

"In March, Baum, another Pittsburg man, came on. He says that he found that the machines were bad in design and in construction.

"Baum had designed some improvements to nail machines —a patent feeder, etc., which he caused to be attached to these machines, and made other changes. The output for the three months after Baum took charge was larger than for the previous three months, but whether this was because more of the machines were kept running by Baum, or because those worked by him worked better than formerly, it is difficult to say. But averaging the output by the number of machines on hand, the output at no time equaled that of the test machine.

"The fact is that an unusually large proportion of these machines were idle from the beginning. During Fuchs' time this was principally caused by the aforementioned want of tools, materials and proper power. And then, and all along afterwards, many of the machines were in the hands of the machinists for repairs and alterations. Besides machinists in the regular employ of the defendant, several of Roth's men were over there at work on the machines.

"Then, again, there was no attempt to run the machines during November because of an agreement which the defendant had with a pool in that business. During the time, therefore, when Fuchs was in charge, machines were operated only in the latter part of October and a part of December—some five or six weeks. But it was now, if ever, that anything like

a fair trial was given by the defendant to these Roth machines. And we have seen from the testimony of Fuchs that such a trial was then impossible. He did not have the means nor facilities for making such a trial. After him the machines underwent such changes in construction to suit the ideas of the successive foremen in charge, that I am compelled to conclude that the machines as furnished by the tool company never had a fair trial at Granite City. Indeed some of the witnesses so testify, notably the operator Anderson.

"The evidence also satisfies me that the operators employed by the defendant were not all of them diligent and trustworthy. Some of them were seen to neglect their duties, and instances of idleness and intoxication are mentioned by the witnesses.

"I think that much of the breaking in the machines, complained of, was the result of the negligence or incompetence of the operators.

"*Conclusion as to Performance by Roth.*—The case then seems to me to be this: The performance by the tool company of its contract to furnish the defendant with machines of as good construction as the test machine, and made of the best material and workmanship, is satisfactorily proved by the evidence. But the performance of the promise that the machines should work as well as the test machine had done, can not be affirmed or denied, because the defendant, by its acts and neglects, has made it impossible to determine that fact.

"Under the circumstances, I think that the defendant is liable for the contract price of these machines, and that a recovery may be had on the petition in this case.

"*The $750 Forfeiture—Delivery.*—It will be recollected that the defendant pleads a forfeiture by the tool company of $750 of the contract price for the first twenty-five machines, for failure to deliver some of them within six weeks after the order for them was given.

"Evidence was offered by the plaintiff showing that this

delay was requested by Wolfe, but was objected to on the ground that it tended to prove a waiver which was not pleaded.

"But it also appears from the evidence that within the six weeks, to-wit, on the thirtieth of October, 1896, the tool company wrote to Wolfe that the last of the twenty-five machines were ready for delivery, subject to his order, and inclosed a bill for the balance of the contract price, $4,950.55. Subsequently, but after the expiration of the six weeks, Wolfe notified the tool company to send the machines over to Granite City, which was done.

"These facts constitute, I think, a constructive delivery within the six weeks, and I do not regard the request by Wolfe for delay as of any consequence. The liability, therefore, of the defendant on the contract price for the first twenty-five machines, is the unpaid balance of the contract price of $9,250, which balance I find to be $378.65 as of the date of the assignment of the claim to the plaintiff.

"*The Real Party in Interest.*—And I think that the defendant's liability for this balance is now to the plaintiff as assignee of the tool company. The defendant, indeed, has pleaded that the tool company, and not the plaintiff, is the real party in interest in this case. But the plaintiff shows written assignments to him by the tool company of each of the four claims counted on in the petition, which assignments are absolute on their face and antedate this suit.

"On hearing, the witness Ed B. Roth was asked by the counsel for the defendant whether the plaintiff paid the tool company anything for any of these assignments of the claims. This question was objected to by counsel for the plaintiff. I sustained that objection because it seemed to me then, and seems to me now, to be immaterial whether the plaintiff paid for the claims or not. This ruling is sustained or sanctioned, I think, by our courts. Nothing else was offered on that issue. The defendant in this proceeding has had the benefit of

all of its counterclaims and offsets against the tool company, and is undoubtedly protected by the assignments of the tool company against any future claim of the latter for the matters assigned.

"*The Five Machines.*—The amount for which the defendant is liable for the five machines, delivered on the November order, is $1,545.89, that being the admitted price of those machines.

"*The Royalty.*—The liability of the defendant for the royalty of one cent per keg is, I think, limited, in this action, to the kegs made up to the date of the assignment of the claim to the plaintiff. The number of kegs of nails manufactured by the defendant to that date, on the machines in question, was 9,166, consequently the royalty thereon is $91.66.

"*The Account.*—In the matter of the account, the defendant is liable for the goods and materials furnished by the tool company at the prices debited in the account on file, it appearing that such prices are reasonable.

"As to the labor there debited, the plea of the defendant that it was furnished gratuitously is not proved. But from the evidence touching the expense of this labor, to the tool company, I think that the charge of fifty cents per hour is too much. The usual price paid to the men by that company was twenty cents per hour, though some especially expert workmen were paid more.

"I conclude that thirty cents per hour for the 590 hours debited in the account is a reasonable allowance to the tool company for the work furnished the defendant.

"This reduces the claim of the plaintiff on the account from $1,213.01 to $1,095.01.

"*Conclusion.*—I find for the plaintiff on the several claims contained in the answer of the defendant pleaded in recoupment against the claims set forth in the petition. Also on the pleas of payment.

"And as of the date of this suit I find for the plaintiff on his several causes of action as follows:

"(1) Upon the first cause of action I find for the plaintiff and assess his damages at the sum of three hundred and seventy-eight dollars and sixty-five cents.

"(2) On the second cause of action I find for the plaintiff and assess his damages at the sum of fifteen hundred and forty-five dollars and eighty-nine cents.

"(3) I find for the plaintiff on the third cause of action and assess his damages at ninety-one dollars and sixty-six cents.

"(4) Upon the fourth cause of action I find for the plaintiff and assess his damages at ten hundred and ninety-five dollars and one cent.

"And I recommend that the plaintiff have judgment against the defendant for the aggregate of said findings, to-wit, for the sum of three thousand one hundred and eleven dollars and twenty-one cents, with interest thereon at the rate of six per cent per annum from the date of this suit.

"All of which is respectfully submitted.

"ARBA N. CRANE, Referee."

The wire company filed a motion to set aside the report of the referee, which the court overruled. It then filed a motion for new trial, which was also overruled, and judgment was rendered on the finding of the referee, from which the wire company appealed.

I. The B. Roth Tool Company assigned in writing the claim in controversy to Charles B. Roth, respondent, before the commencement of the suit. Appellant offered to prove that this assignment was voluntary and that respondent paid no consideration therefor. The referee excluded this evidence. This ruling is assigned as error. The assignment of the claim was executed by the B. Roth Tool Company by its president and attested by the secretary with the corporate seal

attached.   The affixing of the seal by the secretary of the corporation furnished prima facie evidence that the assignment was the act of the corporation.   4 Thompson on Corporations, sec. 5054; Campbell v. Pope, 96. Mo. l. c. 472. The evidence offered was not to deny the assignment but to show that it was without consideration.   Pomeroy in his work on Remedies and Remedial Rights, at section 132, says:  "It is now settled by a great preponderance of authority, although there is some conflict, that if the assignment, whether written or verbal, of anything in action is absolute in its terms, so that by virtue thereof the entire apparent legal title vests in the assignee, any contemporaneous, collateral, agreement by virtue of which he is to receive a part only of the proceeds . . . or even is to thus account for the whole proceeds, or by virtue of which the absolute transfer is made conditional upon the fact of recovery . . . does not render him any the less the real party in interest; he is entitled to sue in his own name, whatever collateral arrangements have been made between him and the assignor respecting the proceeds.   The debtor is completely protected by the assignment."   This statement of the law is approvingly cited by our Supreme Court in Guerney v. Moore, 131 Mo. l. c. 668, in an opinion discussing sections 1990 and 1991, Revised Statutes 1889, of the Practice Act.

In Haysler v. Dawson, 28 Mo. App. 531, it was held that the Practice Act, which requires a suit to be brought in the name of the real party in interest, does not "prevent an assignee of accounts from suing on them in his own name, when the agreement is that he holds them solely for the purpose of the action."   It was immaterial, so far as the appellant is concerned, whether the assignment was for a valid consideration or for no consideration.   It was fully protected by the assignment from another suit by the corporation, nor was it cut off by the assignment from any defense or counterclaim it had against the B. Roth Tool Company.   The referee did not err in excluding the testimony.

II.   It is contended by appellant that the referee erred in admitting evidence tending to show that there was a waiver of the time in which the machines were to be delivered, for the reason that no waiver was pleaded by the respondent.   The referee did not admit the evidence on the theory that there had been a waiver of delivery, but on the theory of a constructive delivery within the contract period and he found as a fact that there had been a constructive delivery.   The evidence on this point is that within the contract period for the delivery of the machines, the tool company wrote Wolfe, the president of the appellant, that the machines were ready for delivery subject to his order, inclosing a bill with the notice, for the balance of the contract price of the twenty-five machines.   Subsequently, but after the expiration of the time in which the machines were to be delivered, Wolfe notified the tool company to send the machines to Granite City, which was immediately done.   The place of delivery, under the contract, was at Granite City, across the river from the city of St. Louis, where the machines were manufactured.   The notice to Wolfe that the machines were completed and ready for delivery was an offer to deliver, and notice that the machines would be held at the shop for the accommodation of the wire company, if it was desired, until it was ready to set them up.   The retention of the bill for the balance due on the twenty-five machines and the subsequent order of the wire company to ship the machines, without making any claim for the rebate, is evidence tending to show that both parties understood that the machines were constructively the property of the wire company from and after the date of the reception of the notice of their completion by it, and subject to its order as to date of shipment.

III.   W. A. Fitch, testified by deposition, that he was secretary and superintendent of the Pittsburg Wire Company of Pennsylvania, and that he was an expert machinist and especially familiar with all patterns of wire-nail machines; that

in the months of January and April, in the year 1897, he visited the works of appellant at Granite City and examined the machines furnished by the B. Roth Tool Company. These he pronounced poorly constructed and very deficient.

He was not cross-examined.

It is shown in the evidence that the Pittsburg Wire Company and the appellant had some kind of business relations by which they were closely connected and were practically under one management.

In rebuttal, respondent's witnesses were permitted, over the objection of appellant, to testify to declarations and statements made by Fitch, when on his mission of inspection, tending to contradict his evidence in respect to the character of the machines and that he promised the tool company to pay for the machines.

The evidence is that Fitch was the superintendent of the Pittsburg Wire Company and tends to show that as such superintendent he was also a chief officer of the defendant company, by reason of its close relations with the Pittsburg Wire Company. Fitch, as the superintendent of both companies, went to Granite City for the express purpose of inspecting the machines furnished by the B. Roth Tool Company, and we think declarations and statements made by him while in the performance of that duty, against the interest of the appellant in respect to these machines, was competent as original evidence. If so, then the fact that these declarations tended to contradict his deposition did not destroy their admissibility as evidence.

IV. It is insisted by appellant that the referee misconstrued the contract in holding that the machines were to be as good or better than the sample machine that was tested on this side of the river. The contracts of September first and seventh, together make up the final agreement. The referee has gone over the whole ground in discussing these agreements in his report and has left nothing more to be said on the

subject.   His conclusion that the machines were sold by sample, we think, is the only logical one to be drawn from a construction of the contract as a whole.

V.   Appellant contends that the finding of the referee is against the evidence and the weight of the evidence, and asks the court to review these findings.   This request raised a much mooted question of practice in this State, to-wit, whether or not an appellate court will, in a compulsory reference case at law, review the findings of the referee on appeal on proper objections made in the trial court, and where the evidence is brought up by a bill of exceptions.   The decisions of the Supreme Court are in conflict on this question.   They are uniform that in such a case the trial court may review the findings of the referee and make findings of its own, and that in equity cases the appellate courts may also review the evidence and make its own findings, and that it is not bound by the findings of either the referee or of the chancellor.   In Franz v. Dietrick, 49 Mo. 95; The Wiggins Ferry Company v. The Chicago & Alton R. R. Co., 73 Mo. 389; Bank v. York, 89 Mo. l. c. 374; Lingenfelder v. The Wainwright Brewing Co., 103 Mo. 578; Vogt v. Butler, 105 Mo. 479; Smith v. Baer, 66 S. W. 166, and Utley v. Hill, 155 Mo. 232, it was held that the findings of a referee in a compulsory reference case should be treated as a special verdict and were not reviewable by an appellate court where there was substantial evidence to support the findings.

The question was not before the court for decision in Utley v. Hill, supra, for the reason the evidence heard by the referee was not brought up by the bill of exceptions, and what is said in respect to the practice of reviewing or not reviewing the evidence by an appellate court was *de hors* the record and for this reason the decision is not a controlling authority on the question of practice.   And in Smith v. Baer, supra, it was said by MARSHALL, J., who wrote the opinion in Utley v. Hill, supra, that the practice of reviewing findings of

the chancellor on conflicting evidence in equity cases will not be extended to cases tried by a referee in compulsory reference cases. In this case the court held that the abstracts furnished by the appellant were not full enough to inform the court as to whether or not there was substantial evidence to support the findings of the referee. There was, therefore, no evidence before the court by which it could review the findings. Here, again, the question of practice, as to whether or not the court would review, was not properly before the court. Besides, the authority of this case as to this question of practice is weakened for the reason that one of the four judges (ROBINSON) who participated in the decision, concurred in the result, and another judge (VALLIANT) in a separate opinion in respect to the question of reviewing the findings of the referee used the following language: "I maintain that, as long as we adhere to the practice of reviewing the findings of facts by a referee in equity cases, and setting those findings aside and substituting our own when we are of the opinion that the evidence so requires, we should treat his findings of facts in a law suit in the same way."

Smith v. Baer, and Utley v. Hill, supra, are the most recent utterances of the Supreme Court upon this question of practice. But we do not regard them as authoritative for the reasons above stated. We must, therefore, look to the line of decisions of the Supreme Court holding to a contrary rule and out of the conflict ascertain if possible the most recent authoritative decision of the Supreme Court on the question and follow it.

In Maguire v. McCaffrey, 24 Mo. 552, it was held that under the Practice Act of 1849 the findings of the referee were reviewable by the Supreme Court. And in Ely v. Ownby, 59 Mo. l. c. 441, it was held, NAPTON, J., writing the opinion, that "As the referee reported to the court all of the evidence on which he acted, there could be no question that the court could review his conclusions, and correct them when

erroneous. And this court must determine the point in controversy, as the circuit court would upon the evidence reported." The same learned jurist, in Smith v. Paris, 70 Mo. 615, said that the Supreme Court was not bound to adopt or reject the report of a referee *in toto* but might adopt it with modifications. In Manufacturers' Sav. Bk. v. Big Muddy Iron Co., 97 Mo. 38, it was held, BLACK, J., writing the opinion, that "Where there is evidence to sustain the finding of a referee, and there is no clear showing of mistake, it will not be disturbed." In Caruth-Byrnes Hdw. Co. v. Wolter, 91 Mo. 484, it was held, BLACK, J., writing the opinion, that the findings of facts by a referee in a case of compulsory reference might be reviewed by the Supreme Court. This case and the case of Ely v. Ownby, supra, were approved in Bender v. Matney, 122 Mo. 1. c. 255, in an opinion by BURGESS, J., where it was held that the Supreme Court was not bound to adopt or reject the report of a referee in its entirety, but might adopt it with modifications. Wentzville Tobacco Co. v. Walker, 123 Mo. 1. c. 671. In Small v. Hatch, 151 Mo. 300, it was held that in a compulsory reference case, "the court may, on the motion of either party, review the findings of the reference on the evidence reported and make its own findings, and for the same reasons the judgment of the circuit court is reviewable by the appellate court." And in Williams v. Santa Fe R'y Co., 153 Mo. 1. c. 495, the same learned judge writing the opinion, said: "The reference of this case was by consent of both parties duly entered of record, but it was referable without the consent of either. The long and intricate account rendered it peculiarly proper for a reference. In a word, it was a case for a compulsory reference. In such cases it is the settled law of this court that the circuit court may, on a motion of either party, review the findings and this court on appeal may review the findings and affirm or reverse the judgment of the circuit court in whole or in part (R. S. 1889, sec. 2138; State ex rel. v. Hurlstone, 92 Mo. 1. c. 333;

Wentzville Tobacco Co. v. Walker, 123 Mo. 671; Caruth-Byrnes Hardware Co. v. Wolter, 91 Mo. 484). On this point of practice both parties are agreed."

In this state of the decisions of the Supreme Court, we conclude that Small v. Hatch, and Williams v. Railroad, supra, are the most recent authoritative decisions of our Supreme Court on this question of practice, and hold that it is the proper practice for an appellate court, in cases of compulsory reference where the proper motion was filed and when the evidence taken by the referee is brought up by the bill of exceptions, or on full abstracts, to review the findings of the referee and of the trial court and to approve, reverse, or modify them. But, we think, to warrant an appellate court to disturb the findings of the referee that have been adopted by the trial court, the evidence should be clear and convincing that the findings are the result of mistake, or clearly against the greater weight of the evidence.

There are over four hundred pages of printed testimony in the record, and it is not within the scope of an opinion to set out any considerable portion of it. The referee in his report has made a fair summary of the evidence and, in our opinion, a correct one.

The respondent sued on the contract and alleged compliance with its terms. These terms required that the Roth Tool Company should not only furnish the number of machines called for by the contract, but that they should be "as good or better than the sample machine" and should "work as well or better" than the sample. The answer pleaded a breach of these warranties and alleged, in substance, that the machines were not as good and did not work as well as the sample machine.

In this condition of the pleadings it is not sufficient for appellant, to maintain his action, to show merely that his assignor furnished the number of machines called for by the contract, but he was required to go forward and show by evi-

dence that the machines were as good as the sample. He met this requirement by evidence to the effect that the machines furnished were made by the same pattern, of the same material, and at the same shop, and by the same mechanics as the sample. We think this evidence made out a prima facie case for respondent. For it would be presumed that if the machines were made exactly like the sample, and out of the same class of material, and in the same shop by the same workmen, they would work as well.

To overthrow this prima facie case made by plaintiff, appellant introduced the evidence of its employees, mechanics and experts, which tended to show that the machines did not work as well as the sample; that they were not as well made; that they would fall down and easily got out of order, and that they would not make good nails. To meet this phase of the evidence respondent offered evidence in rebuttal tending to show that the machines did not have a fair trial in appellant's factory; that appellant's power was insufficient and irregular, and that it failed to provide necessary tools and implements for the successful operation of the machines, and that its employees who had charge of the operation of the machines were incompetent and prejudiced against that pattern of machine. In this state of the evidence the learned referee found that it could not be known for a certainty whether or not the machines were as good as the sample.

The sale was by sample and under a contract that the machines should be as good or better and work as well or better than the sample machines. The warranty implied by this contract was that the machines should correspond to the sample and should be as good and work as well as the sample. After being furnished the machines were retained by the wire company, who, after trying them, did not offer to return and rescind the contract. But the evidence is that the purchaser continually made complaints to the seller that the machines were not satisfactory, and the evidence is also that both the

purchaser and the seller made frequent efforts to remedy their defects. In this state of the evidence no inference can be drawn that the machines, after having been tested, were satisfactory to the purchaser. The purchaser alleges as a defense, to the counts of the petition to recover the balance of the purchase price of the machines, a breach of warranty implied by the conditions of the sale. In this situation of the case the burden was on the wire company to prove the breach of the warranty that the machines were not as good and did not work as well as the sample. Branson v. Turner, 77 Mo. l. c. 495; Gould v. Stein, 149 Mass. 570; Ogden v. Beatty, 137 Pa. St. 197. According to the findings of the learned referee, the wire company failed to prove the breach of the warranty by a preponderance of the evidence, as he found that it could not be known for a certainty whether or not the machines were as good as the sample, and that he was satisfied that when the machines were delivered they were as near alike as ordinary care and skill could make them. The fact nevertheless remains, as shown by all the evidence, that the machines, from some cause or other, utterly failed to perform the work for which they were designed or to perform the work which the sample machine had performed, and my associates are of the opinion that the evidence is clear and convincing that the machines were not as good and did not work as well as the sample, and, hence, that there was a breach of the tool company's warranty that they should be as good and work as well as the sample, and that the finding should have been for the defendant on the first and second counts of the petition, unless the evidence shows that the machines were worth more than the defendant has paid the tool company on the contract price for them.

The purchase price of the machines was three hundred and seventy dollars each, or a total of ten thousand one hundred dollars. The referee found that there was due on the order for twenty-five machines, three hundred and seventy-

eight dollars and sixty-five cents; and on the second order for five machines, fifteen hundred and forty-five dollars and eighty-nine cents, making a balance on the purchase price of the thirty machines of nineteen hundred and twenty-four dollars and fifty-four cents. The appellant kept all the machines and at no time offered to return any of them to the Roth Tool Company.

In this state-of the case, assuming that there was a breach of the warranty that the machines should be as good or better than the sample and work as well or better, the amount which appellant is entitled to recoup from the purchase price would be the difference between the contract price and the actual value of the machines for manufacturing nails, if they were of any value for that purpose. If of no value for making nails, as the evidence tends to show, then the appellant is entitled to recoup the difference between the contract price and the value of the machines for some other purpose. Schoenberg v. Loker, 88 Mo. App. 387. There is no evidence that they were of value for any other purpose. If credence is to be given to the witnesses who operated the machines, and the experts who examined and tested them, and their utility is measured by their output, we are bound to pronounce them valueless as nail-making machines, and we find that the Continental Wire Company has paid much more money for the machines than they were worth and conclude that the finding on the first and second counts of the petition should have been for the appellant. It is, therefore, considered that the finding of the referee on the first and second counts of the petition be set aside and for naught held, and we proceed to find for the appellant on each of said counts. The finding of the referee on the third and fourth counts of the petition is approved.

It is, therefore, considered that the judgment be reversed and the cause remanded with directions to the circuit court to enter judgment for appellant on the first and second counts of the petition, and for the respondent on the third and fourth

counts, for the several amounts found by the referee to be due on said third and fourth counts. The cost of appeal is to be taxed to plaintiff. *Barclay*, and *Goode*, *JJ.*, concur.