## DIXON, Appellant, v. DIXON, Respondent.

St. Louis Court of Appeals, October 18, 1904.

(Per Reyburn, J.)

ACCORD AND SATISFACTION: Maintenance of Children. Where, pending a suit for divorce by a wife against the husband, they reached an agreement which was not reduced to writing for a settlement of all their differences and in pursuance of such settlement, the husband paid the wife a sum of money and they exchanged deeds for various lands held by each, such settlement was an accord and satisfaction and barred the wife's right to recover for the maintenance thereafter of two minor children, though they were not specifically mentioned in the settlement.

Dissenting Opinion by Bland, P. J.

1. REFERENCE: Findings of Referee: Review by Court. The circuit court may, on motion of either party, review the findings of the referee and make its own findings, and the appellate court, on appeal, may review the proceedings and affirm or reverse the judgment of the circuit court.

2. DIVORCE: Maintenance of Children. It is not the policy of the law to deprive children of their rights on account of dissension of their parents, to which they are not parties, and a divorced wife may maintain an action against her divorced hus-

band for the maintenance of their children, although she deserted him and refused to live with him and withheld their custody and society from him.

3. **ACCORD AND SATISFACTION: Burden of Proof.** It devolves upon a party who asserts a settlement in defense of an action, to establish by a preponderance of the evidence that the settlement included the matters which are involved in the suit.

Appeal from St. Louis City Circuit Court.—*Hon. Franklin Ferriss*, Judge.

AFFIRMED.

*Henry A. Hamilton, Thomas Stallings* and *Henry Higginbotham* for appellant.

(1)   In cases of compulsory reference, where the proper motion was filed, and where the evidence taken by the referee is brought upon full abstract, the appellate court will review the findings of the referee and of the trial court and approve, reverse, or modify them. Buxton v. Debrecht, 95 Mo. App. 599; Roth v. Continental Wire Co., 94 Mo. App. 236; Williams v. Railway, 153 Mo. 495; Small v. Hatch, 151 Mo. 300; Wentzville Tobacco Co. v. Walker, 123 Mo. 671; State ex rel. v. Hurlstone, 92 Mo. 327; McCullough v. DeWitt, 163 Mo. 306.   (2) · It is the duty of the father to provide the necessaries of his minor children, and nothing will excuse him from performing that duty, but an award of the custody of the children, by a competent court, to the mother, together with an order of adequate provision for their support out of the father's estate; and the compliance by the father with the court's order. Biffle v. Pullam, 114 Mo. 50, 21 S. W. 450; Penningroth v. Penningroth, 71 Mo. App. 438; Chester v. Chester, 17 Mo. App. 657.   (3)   When a marriage is dissolved by divorce, it is still the father's duty to provide for his minor children; and when they remain with the mother, and she pays for their necessary support and education

she is entitled to recover from the father the amounts so expended. Keller v. St. Louis, 152 Mo. 596, 54 S. W. 438; Rankin v. Rankin, 83 Mo. App. 335; McCloskey v. McCloskey, 93 Mo. App. 393, 67 S. W. 669; Meyers v. Meyers, 91 Mo. App. 151. (4) A divorced man, who leaves his children with their mother, and does not assert his right to their custody by appropriate proceedings in court, waives that right; his willingness or offers to support them on condition he be given their custody is no defense to an action by the mother for the sums expended in providing for the children. Accord and satisfaction does not operate as a bar to matters not contemplated by the agreement. The burden is on defendant to establish his defense of accord and satisfaction by a preponderance of the evidence and he must not only establish a settlement, but also that it covered and included the very items of expense incurred by plaintiff. 1 Cyc. of Law and Procedure, pp. 308, 348; Ferguson v. Davidson, 147 Mo. 664, 49 S. W. 859; Supply Co. v. Wolfe, 127 Mo. 616; Littell v. Ellison, 17 N. Y. Supp. 294; Scully v. Delamater, 28 Fed. 114.

*Jamison & Thomas* for respondent.

(1) The evidence in this case establishes the fact that the parties settled all of their differences and passed deeds to their respective properties on or about October 28, 1895; that at that time defendant paid plaintiff $1,000 in satisfaction of all claims, past, present and future which she claimed to have against him. The court, therefore, properly entered judgment for the defendant. (2) "A husband has the right to establish his domicile at any time, wherever he pleases, and the wife must follow him through the world. If she refuses to go with him, his own conduct being upright and honorable in the premises, she places herself in the wrong, and while she persists, he is not bound to support and maintain her." Schuler's Domestic Relations, sec. 38;

Schuman v. Schuman, 93 Mo. App. 99; Messenger v. Messenger, 56 Mo. 329; Kosta v. Kosta, 43 Mo. App. 115. (3) Where the wife deserts her husband and takes the children with her, he is not liable for maintenance and support of said children furnished by her. Chester v. Chester, 17 Mo. App. 657; Fitler v. Fitler, 33 Pa. 50; Baldwin v. Foster, 138 Mass. 449; Schuler's Domestic Relations, sec. 66, p. 110; Rogers v. Turner, 59 Mo. 116.

REYBURN, J.—After a thorough review of the testimony in this proceeding, to my mind the action of the opposing parties in the negotiations finally closed October 28, 1895, must be construed as a decisive disposition of all claims and subjects of dispute between them, and that no reasonable doubt exists that the adjustment then reached was at that time so understood, treated and intended not merely by both plaintiff and defendant but by the counsel of the opposite parties. The consummation of this transaction was reached only after protracted deliberation and parley with the aid of professional advisers, and after situations in the negotiations had been presented where a specific settlement appeared destined to fail and its abandonment ensue. With the exception presently adverted to, the narrative of all conversant with and participating in the preliminary mediations, which ultimately ripened and culminated in delivery of the instruments of conveyance and the substantial payment made, demonstrates that all concerned in and participating in the transaction from its inception to its final stage, so understood and deemed the purpose and effect of the compromise proposed and carried out. The extracts quoted from the testimony (in separate opinion by BLAND, P. J.), suffice to establish this, and if required, they might be elaborated by cumulative proof taken from the declarations of those attending the discussions and engaged in the completion of

the negotiations. The correspondence between opposing counsel further lends weight to this interpretation and the surviving member of the legal firm which represented plaintiff's interests and who took an active part in her behalf, as recited in the foregoing statement, testified that the payment and passing of the deeds constituted a full settlement of all differences between the parties at the time. Arrayed against the testimony of these witnesses, the disclaimor of plaintiff stands conspicuously apart and without corroboration, opposed in the smallest details to the recollection and testimony of all including her own attorney, and especially affirming that during the time of the deliberations and intercessions no thought or mention was made of the children, their custody or maintenance. That the past expenditure upon the children and provision for their future were not in the minds of the parents and failed to receive attention or consideration by them at such a critical period in the lives of all, would seem incredible. At this stage the claim of appellant against respondent for the expenses incurred by her in the maintenance and support of the older children existed, at least as clearly as the like demand for the children later born, as much of the cost attending the younger had not accrued and, more logically, expenses that were more closely determined in amount should be treated as embraced in the settlement than disbursements respecting the younger children at least partially prospective and to be incurred in the future. In my judgment the understanding then reached and carried into effect between the parties comprehended and disposed of all claims on the part of the plaintiff against the defendant and is an insurmountable barrier precluding the maintenance of this action, and the judgment for tihs reason, if for no other, should be affirmed. *Goode, J.,* concurring, the judgment is therefore affirmed.

SEPARATE AND DISSENTING OPINION.

BLAND, P. J.—The suit is to recover $4,934.30 for money alleged to have been expended by plaintiff in the maintenance, education, etc., of four children born to plaintiff and defendant as husband and wife. The first item of the amount (filed with the petition) is dated November 2, 1892, the last February, 1895.

Besides a plea of the five years' statute of limitation as to a larger part of the account, there are two separate defenses set forth in the answer. First, that the plaintiff without the consent of the defendant, and against his will, and without adequate cause abandoned the defendant, took the children with her and refused to live with defendant. Second, accord and satisfaction of all matters in dispute between them after the account had accrued.

There was a compulsory reference of the case to Hon. Jas. F. Green, who, after hearing the evidence, excluded all of the account which had accrued more than five years before the commencement of the suit, found that defendant was indebted to plaintiff on the other items of the account in the sum of $750, and in his report recommended judgment for that sum. Defendant filed exceptions to the report of the referee and moved that judgment be entered for defendant. The exceptions to the report were sustained, the report disapproved, and the court found the issues for the defendant, and adjudged that plaintiff take nothing by her suit. Exceptions were duly saved to the ruling of the court in sustaining defendant's exceptions to the report of the referee, and to its action in entering judgment for the defendant.

It is the law of this State that the circuit court may, on motion of either party, review the findings of a referee, and make its own findings, and that appellate courts, on appeal, may review the proceedings and affirm or reverse the judgment of the circuit court. Wil-

liams v. Railway, 153 Mo. l. c. 495, 54 S. W. 689; Lack v. Brecht, 166 Mo. 242, 65 S. W. 976; Caldwell v. Wright, 88 Mo. App. 604; Roth v. Continental Wire Co., 94 Mo. App. 236, 68 S. W. 594.

It appears from the pleadings and the evidence that plaintiff and defendant were twice married. First, on February 16, 1877. Two children, Cyrus C. and Henry M. Dixon, were born of this marriage. On the petition of the wife, a divorce was granted her. After the divorce, the parties were, on May 27, 1889, married a second time; of this marriage two more children were born, William and Thomas Willard Dixon. In 1892, the home of plaintiff and defendant was in Vernon county, Missouri. In May, 1892, before the birth of Thomas Williard, the plaintiff, against the will and over the protest of the defendant, took their three children and went to her mother's in the State of Illinois. She testified that when she left her husband, it was her intention never to live with him again in Missouri. Defendant owned eighty acres of land in Vernon county but the title was in his brother. Plaintiff was dissatisfied with this arrangement. A short time before plaintiff left defendant, she had received $3,200 for her interest in some lands (known as the bottom farm), which she had inherited from her father. Defendant testified as follows:

"After she left me on May 14, 1892, I made up my mind that it was much better for me to live with my family. I wrote Mrs. Dixon and stated in my letter that I was willing to have my brother Grant make us a joint deed, if she was willing to take what money she had received for her interest in this bottom farm and invest it in land in Illinois, I was willing to go to Illinois and live with them and do for them the best that I could. She wrote and accepted the proposition. I had my brother Grant make out the deed to she and me to show her that I was in earnest. I sent her the deed and stated in that letter for her to hold the deed until she purchased

the farm with the money that she had received for her interest in the bottom farm, but instead of holding this deed, she sent it to Nevada as soon as possible and had it recorded.  The latter part of July I arranged my business, that is, I sold off what little stock I had, loaded up what little goods she had left me, traveled through the month of the latter part of July and August, four hundred miles, through the hot sun with this team and wagon and when I reached the Stallings farm, I received a very cold reception.  A few days after I arrived, she and I got in the buggy and went to her brother Thomas Stallings' house; I believe it was in Washington county, below Mt. Vernon.  Mr. Thomas Stallings got in the buggy with me and we traveled all over that section looking at farms, but didn't find anything that suited us.  After a short visit with them, she and I got in the buggy and went back to the Stallings farm.  At that time she became very indifferent—was so indifferent that she would not talk about buying land. I finally hitched my team and started back to Vernon county.  After considering the matter, I turned around and went back and with the advice of her mother— which was always good—she advised us to move to Edwardsville and live there and possibly we could decide on buying a farm.  We moved there the first of September, but she became more indifferent than ever."

He further testified that he did everything he could to induce his wife to return to Missouri with him, but she positively refused to do so; that he was unable to make a living for his family in Illinois, and on November 2, 1892, returned to Missouri.  Letters written by defendant to plaintiff, after his return, showed that he begged and entreated her to return and live with him; that he offered to go to Warrensburg, Missouri, or to Kansas, where she had some relatives, and establish a home, but she refused to return.  Defendant testified that he gave up all hope of ever persuading his wife

to live with him again, and on April 24, 1894, brought suit in the Johnson county circuit court against her for divorce. Notice of this suit was by order of publication. At the June term, 1894, of said court, default was taken against Mrs. Dixon and a final decree of divorce was awarded defendant. Plaintiff was entirely ignorant of the pendency of the suit and was not informed that the divorce had been granted for more than a year after it was granted. But notwithstanding the divorce, defendant, up to March, 1895, continued to write plaintiff begging her to live with him.

On October 16, 1893, plaintiff instituted suit against defendant, in Madison county, Illinois, for a divorce. In her petition, she gave the names of the two younger children, but did not mention the other two. She asked for the custody of William and Thomas Williard, and for a "decree of such property of the defendant and such sums of money to be paid by him to her as the court may deem necessary and proper for the maintenance of herself and two children." Defendant received notice of the suit and in May, 1895, went to Illinois and testified he tried to prevail on his wife to again live with him, withholding from her the fact that he had been divorced from her, intending to remarry her if she would agree to live with him; but that he was personally served with summons in the divorce suit a short time after his arrival in Illinois and he then finally gave up all hope of ever living with his wife.

Plaintiff testified that she had been requested by defendant many times to leave, before she left his home in May, 1892; that when she left, she went with her own free will, with the intention of never returning, and that defendant so understood it. She testified that defendant promised to have the Vernon county land conveyed to their children, that she never asked him to have it, or any part of it, conveyed to her; that they moved to Edwardsville, Illinois, about September 7, 1892, and lived there a little over a month, when the defendant

Dixon v. Dixon.

left her and returned to Missouri; that he might have continued to live at Edwardsville if he had wanted to; that she did not tell him to go; that he left of his own accord, saying he could not get employment in Edwardsville and that was the reason he wanted to go away; that he paid the house rent and furnished money to keep the house for one month; that he asked her to go back to Missouri with him, but wanted the three older boys to remain in Illinois, and she told him if she had to choose between him and her children, she would take her children; that she had plenty of other reasons too for not going back to Missouri with him; that he had abused her time and again and she could not live with him, and he knew that she was afraid of him; that she told him she would never live with him in Missouri, but would live with him in Illinois near her relatives who could protect her.

Plaintiff gave evidence tending to prove the items of her account, stated that in 1895 defendant told her he had made a good deal of money, owned a good farm in Barton county, Missouri, and was making money; that she then demanded of him to do something for the children, but he refused; that when he refused to do anything, then "I made up my mind to try to compel him to do so. I gave him the opportunity to help of his own accord. I didn't like to begin this suit—didn't like to get the children mixed up in it, but I thought that it was my duty to ask Mr. Dixon to help, and if he wouldn't to compel him to help the children. I thought that it was my duty, as much as I disliked it."

Defendant denied that he wanted to leave any of his children in Illinois, denied that he so stated to his wife in November, 1892, or at any other time; on the contrary, he testified that he wanted all of his family together and that he had a father's affection for his children, but that the younger ones had been taught to disrespect him.

The evidence shows that the defendant has contrib-

uted nothing at all to the support, maintenance or education of his three younger children since May, 1892; that the plaintiff has, at her own expense, maintained, clothed and sent them to school, and has about exhausted her means in doing so; that the defendant is prosperous and able to reimburse some of the expense the plaintiff has been put to in this behalf, if he chose to do so.

In respect to the plea of accord and satisfaction, defendant testified that he undertook to settle the divorce suit his wife had brought against him. "I said to her that we would both have attorney's fees to pay; that we would have additional expenses; that I would much prefer to give this money to the children than to give it out in that way. I also said to her that I thought it was not right that I should be deprived of living with my children, and after I put forth the effort that I had, that I should pay her anything, and, again, from the fact that she was worth, at that time, many times more than I was. I said to her that she had an interest in the home place of four hundred and eighty acres of land—a fifth interest. In addition to that she had the larger part of the money she received for her interest in the bottom farm, but, nevertheless, rather than to pay this money to lawyers and other expenses we would have to incur, I would prefer to pay it to the children, and I said to her that four or five hundred dollars would be sufficient, or that it was all that I ought to pay, but she refused to accept the four or five hundred dollars. Finally I said to her that I would make it nine hundred dollars. . . . It was then that I told her that I was divorced. I also told her that I was going to get married. I had lost all hopes of being able to reconcile her. I told her that I felt that I had done my duty and that I had given up all hopes and that I had decided to marry again, and for all those reasons, I was extremely anxious to get this matter settled for all time, for the present, for the past and for the future, so that noth-

ing could come in the future, to-morrow. In addition to this, I suggested that we exchange deeds, that is, that I would give her a quitclaim deed for any property that she had, or might have in the future, and in return she would give me a deed to any interest she might have in my property. She accepted that proposition."

He also testified that his wife said she would accept these terms. She denied that any such offer was made, saying that the matter was talked over between her and defendant, but they came to no agreement. Defendant further testified that they agreed on a day to go to Edwardsville to settle the matter, and that they met in Edwardsville at the office of Mr. Bradshaw, her attorney, and when he reached the office she was out of the notion to settle on the terms proposed by him and said that she would not settle for nine hundred dollars, but that she would settle for twelve hundred dollars. "I said to her and to Mr. Bradshaw that I would not give over nine hundred dollars, and before I would give her over nine hundred dollars, that I would fight the case then pending in the courts at Edwardsville. . . . Mr. Bradshaw told me that if I didn't pay the twelve hundred dollars, that he proposed to push the suit in Edwardsville, then pending, and that he fully expected to offset the divorce that was granted me at Warrensburg, Missouri. . . . I said that before I would give more than nine hundred dollars that I would engage an attorney and fight the case. . . . I left the office and went from there over to Greenville, Bond county, for the purpose of securing the firm of Northcott & Fritz to take charge of this case." He testified that all the features of the controversy were discussed, and that he told his wife he was not there to settle one thing, but everything, the past, present and future, and that the maintenance of the children was mentioned; that in the conversation with his wife, he said to her, "I will give you nine hundred dollars as a settlement in full," and that was for the maintenance of the children,

alimony and for all claims present, past and future, and she accepted it and was to ask nothing more for the support of the children. The matter was not settled on that day and defendant employed Northcott & Fritz to attend to the matter for him and returned to his home in St. Louis.

On October 18, 1895, Northcott & Fritz addressed a letter to Dale & Bradshaw in which they stated, "Our client, Mr. H. M. Dixon, has concluded to accept the compromise and pay your client $1,000 for her interest in the land and a clear settlement of the matter." The thousand dollars was paid, deeds were interchanged between plaintiff and defendant and the divorce suit pending in Madison county was dismissed. Gov. Northcott, in respect to the settlement, testified as follows:

"My recollection of the matter, from correspondence with Mr. Bradshaw and otherwise is, that the question of the determination of the pending suit, wherein Rose Dixon was plaintiff, was a very material point between the parties, and the divorce proceedings in Missouri were to be questioned in the Madison county proceedings, as also were the questions of alimony and support of the children. They were also to be pushed unless settlement was made.

"After the conclusion of the matter, in the correspondence with Mr. Bradshaw and myself, there was nothing remaining to be done except the payment of the thousand dollars, the passage of the deeds and the dismissal of the suit. As attorney for Henry Dixon, my associate, Mr. Fritz, was instructed to conduct this final settlement between him and Rose Dixon, of all matters in controversy between them. My recollection, from review of the record, is that it was dismissed by order of the complainant, and that was the agreement as I understood it—that the thousand dollars paid covered all matters."

Mr. Fritz, in respect to the matter, testified as follows:

"Well, Mr. Jamison, we talked a great deal that I could not recall. Some of it pertained, of course, to this settlement and others to other matters, but I remember that when I got ready to leave, I shook hands with Mrs. Dixon—I remember that—and I said, 'Well, Mrs. Dixon, I guess you and Mr. Dixon have at last come to the "parting of the ways" or "you have agreed to disagree," or something of that kind, and that this will settle matters between you I presume forever, or words to that effect.' Mrs. Dixon said, 'Yes, this ends it,' or something of that kind."

Plaintiff testified that Mr. Bradshaw represented her in the settlement as her attorney. Bradshaw testified that the payment of the $1,000 and the passing of the deeds was a full and complete settlement of all differences that existed between the plaintiff and defendant at that time. The plaintiff's testimony tends to show that the expenditures, which had been made by her for the maintenance and support of her children in the past, were not in her mind or mentioned by any one at the time the settlement was made, nor is there any evidence to be found in the record that this matter was mentioned by any of the parties at the time the settlement was made, or that it was even thought of.

In respect to the two special defenses, the learned referee reported as follows:

"There is much testimony in the record as to what occurred at these various conferences and as to how the parties regarded this adjustment, defendant claiming—as he frequently testified—that it was intended to settle all differences 'past, present and future.'

"No receipt or memorandum in writing of any kind was signed by the parties at the time of this adjustment, and the intention of the parties must be determined from the facts alone as shown by the testimony.

"It may be conceded that plaintiff abandoned defendant when she left him in Vernon county, Missouri, though they subsequently lived together. It was the

duty of the wife to live with her husband and abide by his fortunes, in sickness and health, in poverty and riches, to make his will her law, to live where he may choose to live, and in such style and manner as he may adopt, and when plaintiff, in 1892, left her husband, and thereafter refused to live with him, she deserted him within the meaning of the law and he was clearly entitled to the divorce, which he obtained in the Johnson county circuit court, upon that ground.

"It does not follow, however, that this defense set up in defendant's answer, can avail as against the claim of the plaintiff for the support of their children.

"Mr. Bishop says, in his work on Marriage and Divorce, that it is not the policy of the law to deprive children of their rights on account of the dissensions of their parents, to which they are not parties, and this doctrine has been approvingly cited in several cases in Missouri, to-wit: Rankin v. Rankin, 83 Mo. App. 340; McCloskey v. McCloskey, 67 S. W. 871, 93 Mo. App. 393; Keller v. St. Louis, 152 Mo. 600, 54 S. W. 438.

"Nor is defendant entitled to defeat plaintiff's cause of action upon the defense that he was willing and able to support and maintain his children. If, as a father, he was entitled to their care and custody, the courts were open to him to secure and control them. As is said in the case of McCloskey v. McCloskey, 67 S. W. 672, 'It is not the law of this State that defendant was excused from supporting his children, even if the wife withhold their custody and society from him.'

"There remains to consider, therefore, the further defense of accord and satisfaction pleaded in defendant's answer.

"As to this, it may be said that the parties have the right to make such adjustment of matters of controversy pending between them as the courts might have made for them, and it devolves upon the defendant here to establish by a preponderance of the evidence, that

the settlement included the matters which are involved in this suit. Ferguson v. Davidson, 147 Mo. 664.

"If it was intended by the parties to operate as a settlement of all claims, present and future, which plaintiff might have against defendant, then, the plaintiff had the unquestioned right to make such settlement so far as she was concerned, and if so intended, I think it would operate as a bar to any further claim upon her part, growing out of the transactions included in the settlement:

"I think it is reasonably certain, however, that the attention of the parties was not directed to any other matter than that pending in the circuit court of Madison county, Illinois, namely, the application for divorce by plaintiff and alimony for her support and maintenance and her application for the support of two children named in the petition, to-wit; William Dixon and Willard Dixon, together with the desire on defendant's part to free his lands in Missouri from the title which plaintiff, his former wife, had in them.

"The term 'matter,' mentioned in the letters of the attorneys, as well as the 'matter' referred to in the conversations of the parties, only had in view such matters of controversy as were then pending between the parties.

"In the absence of any agreement in writing, or other specific designations, as to what should be included in the compromise made by the parties, only such matters of difference as then existed could reasonbly be brought within the terms of the settlement, but as to these, the settlement made by the plaintiff and defendant is a complete bar to any further claim on her part, and she is therefore precluded from any recovery as to William and Williard Dixon.

"This disposes of the case except as to such claim as plaintiff may have for the support and maintenance of the two children of herself and defendant (Cyrus

and Harrison) who were in no way referred to in the transactions had by the parties in 1895.

"It is well settled law in Missouri that a divorced father is liable to his former wife for expenses incurred by her in the support of their minor children, the Court of Appeals, in Rankin v. Rankin, 83 Mo. App. saying:

" 'The father is also made by statute primarily the guardian of his children and charged with the care of their persons, education and estate. R. S. 1899, sec. 3478. The neglect of this statutory duty in no wise relieves him from the charges incurred by others in the necessary maintenance of his offspring. The divorce from his own wife does not divorce him from his children. The future welfare of his children is the most powerful motive which nature and social duty implants in the bosom of the father. These obligations in the case at bar rendered it the duty of defendant, to the extent of his ability, to rear and educate his children, which was none the less binding in that their custody was left with the mother. When this charge was neglected by him she seems to have consecrated her entire energies to its fulfillment. The money thus expended by her for a duty which he primarily owed, was just as legal a charge against him as if it had been contributed by a total stranger, for after the obtention of the divorce, that was the legal status which she occupied towards the defendant. If a third party had supplied the children of defendant with the necessaries, a recovery might have been had to that extent without proving any further agreement than that implied by law for the fulfillment of the father's duty to the child, hence in this case there was no necessity for alleging or proving that the money furnished by the plaintiff was in accordance with the express agreement with the defendant.' "

In respect to the care and custody of Cyrus and Henry Harrison Dixon, the referee made the following finding:

"I find from the testimony that plaintiff had the care and custody of Cyrus Dixon from February 19, 1896, until August, 1898, when he went to his father. Cyrus became of age in November, 1898. I find that his mother paid for his board, tuition in school, for his clothing and for other incidental expenses.

"She also had the care and custody of Henry Harrison Dixon during the five years preceding the institution of this suit, paid his tuition while in school, board, furnished his clothes and other necessaries.

"The testimony shows that in the neighborhood in Illinois where the parties lived board and lodging were reasonably worth from $2.25 to $2.50 per week or about $10 per month.

"Plaintiff paid for tuition for Cyrus in the latter part of '96 and first of 1897, forty-six dollars.

"It is also shown in the testimony that these boys worked, a portion of the time at least, upon the farm of their mother, and while they were not farm laborers in the ordinary acceptance of that term, they rendered services on the farm which were of value and for which plaintiff would otherwise have had to pay.

"Upon a careful examination of the testimony in relation to the expenses incurred by plaintiff altogether, and allowing such offsets as ought to be allowed for the services of plaintiff's sons, I am of the opinion, and so recommend that judgment be entered in favor of the plaintiff as follows:

"Expenditures, board, etc. incurred on the part of Cyrus Dixon, 2 1-2 years, the sum of ............................... $250.00

"Such expenditure for board, etc., on part of Harrison Dixon, in the sum of .......... $500.00

"Making a total of .................... $750.00

"For which amount the referee recommends judgment in favor of plaintiff."

St. John v. Insurance Company.

I think the findings of the referee are supported by the greater weight of the evidence, and that his conclusions of law are sound, and that his report should have been approved by the circuit court.

I think the judgment should be reversed and the report of the referee confirmed.