70 F.Supp. 589 (1947)
HUBBARD
v.
LOCK JOINT PIPE CO.
No. 4906.
District Court, E. D. Missouri, E. D.
February 21, 1947.
*590 Forrest M. Hemker, of St. Louis, Mo., for plaintiff.
George E. Heneghan, of St. Louis, Mo., for defendant.
HULEN, District Judge.
This is a personal injury action for damages resulting from collision of car driven by plaintiff and truck belonging to defendant. The jury's verdict was $5,000. Defendant's motion in the alternative, for judgment in accordance with motion for a directed verdict or for new trial, is before the Court. Three assignments have been briefed: (1) There is no substantial evidence the truck driver was acting in the scope of his employment at the time of the accident; (2) the Court failed to admit evidence of declarations of the truck driver; and (3) the verdict is excessive.
*591 I. In determining the first point  that defendant was entitled to a directed verdict because there is no substantial evidence to support a finding the driver of the truck was engaged in business for defendant in the scope of his employment at the time of the accident  the Court is required to take plaintiff's evidence as true, with such inferences as may reasonably be drawn therefrom, and to disregard defendant's contravening evidence. Considering the record on this issue, in the light of the rule, we find: Charles W. Gray was in the general employ of defendant solely as a truck driver at the time of the accident; the truck was owned by defendant; Gray was driving the truck at the time the truck collided with car in which plaintiff was riding; Gray had been employed by defendant in capacity of truck driver "on and off" for five years; the truck had defendant's name on it; the truck was a commercial vehicle adapted to defendant's business uses for hauling sewer pipe; defendant's factory was located about five miles from St. Louis at Valley Park, Missouri; defendant's trucks were kept at the factory where sewer pipe was loaded for delivery; Gray had no regular hours but usually worked from 8:00 a. m. to 5:00 p. m.; it was Gray's practice if he left defendant's factory at Valley Park late in the evening to drive the truck to his home in St. Louis, leave the truck at his home and start from his home the following morning and make the delivery; if Gray made a delivery late in the day he frequently stopped at his home for the night on the way from the place of delivery to the factory and kept the truck at his home and continued the trip to Valley Park in the morning; under this practice Gray kept the truck at his home overnight three or four times a week; Gray's custom of keeping the truck at his home overnight was known to and approved by the defendant; on the night prior to the accident Gray had unloaded late in the day, drove the truck to his home, kept the truck at his home overnight, and proceeded to the defendant's factory at Valley Park the next morning; "about a week prior" to the accident Gray had been instructed by defendant to take the truck to Bourbine-Young, a repair shop, to get "an air change" the first chance he had; in giving the instruction defendant set no time for compliance; it rained the day of the accident and because of the muddy condition at the place where pipe was being delivered Gray concluded he would be unable to make delivery of pipe Monday morning; for the reason that pipe could not be delivered on Monday morning Gray decided Saturday, the day of the accident, to take the tractor of the truck to Bourbine-Young on Monday to have the repairs made as instructed by defendant; Gray returned to Valley Park after making a delivery and left the truck; later the same evening he went to defendant's parking lot and got the tractor and after stopping at a tavern started toward his home at about 9:30, intending to keep the truck at his home until Monday morning and then drive it to Bourbine-Young for repairs; Gray was on his way to his home when he struck the car in which plaintiff was riding; Gray, in operating the truck at the time of the accident, was following his usual route from Valley Park to St. Louis; the accident happened on a public street; it was the usual practice to take only the tractor to the repair shop unless repairs were to be done on the trailer; to get an "air change" the trailer was not needed; Gray had taken trucks driven by him to Bourbine-Young for repairs on previous occasions.
On this evidence we do not deem it necessary to discuss the law on presumption arising solely from proof of ownership and general employ of the driver of the truck at time of accident. Plaintiff's case, while including proof of such facts, is not limited to them. The crucial question is: Was the truck driver at the time of the accident engaged in the master's business within the scope of his employment? Did the defendant place the driver of the truck in such a situation that a person of ordinary prudence, conversant with defendant's business, would be justified in presuming the driver had authority to perform on behalf of defendant the work in which he was engaged at the time of the accident? Existence and scope of agency of the driver need not be established by direct and positive evidence. The authorities are in agreement on the rule by which such relationship *592 shall be determined. In Restatement of the Law, Agency, Sec. 228, it is stated:
"(1) Conduct of a servant is within the scope of employment if, but only if:
"(a) it is of the kind he is employed to perform, * * *
"(b) it occurs substantially within the authorized time and space limits, * * *
"(c) it is actuated, at least in part, by a purpose to serve the master * * *
"(2) It is a question of fact, depending upon the extent of departure, whether or not an act, as performed in its setting of time and place, is so different in kind from that authorized, or has so little relation to the employment, that it is not within its scope."
The Court declared, in Silent Automatic Sales Corporation v. Stayton, 8 Cir., 1930, 45 F.2d 471, loc. cit. 474:
"The great weight of reason and authority is to the effect that where an employee is returning from work, with the consent and by authority of the employer, in a vehicle owned or used in the business of the employer, he is acting within the scope of his employment."
To like effect is the holding of Burgess v. Garvin, Kansas City Court of Appeals 1925, 219 Mo.App. 162, 272 S.W. 108, loc. cit. 114  a case in which the servant, for the purpose of selling goods, used an automobile owned by him, and which at the time of accident he was driving to a garage to have a tire fixed:
"* * * The repairing of the tire would seem to have been within the scope of his employment, for the reason that he was conditioning his car so that it could be used in the business in which he was engaged for his master. Berry on Automobiles, § 1210 (4th Ed.)."
In Steinmetz v. Saathoff et al., Kansas City Court of Appeals 1935, 84 S.W.2d 437, loc. cit. 438, the driver had delivered his car to a garage for repairs, the repairs had been made and he was on his way back to take up his duties with the master when the accident happened:
"* * * The repairing of his car and bringing it back for readiness and use was in the scope of his employment, since he would be, and was, open to call at any time. * * *"
In the instant case the driver in taking the truck by his home on the way to the repair shop was serving his personal use of riding home. Such personal benefit to the servant does not destroy the dual effect of his act. The defendant's interest also was being served at the same time. It was held in the Silent Automatic case, supra, that where the master places at the disposal of his servant an automobile to be used by the servant in going to and from his work, transportation is beneficial to both and the relation of master and servant continues where the automobile is used for such purpose. We consider the facts in the Silent Automatic case much more favorable to defendant than the facts in the present record. If the act in which the servant is engaged is for the benefit of the employer, either directly or indirectly, the act is usually within the general scope of the servant's employment. See Byrnes v. Poplar Bluff Printing Co., Mo.Sup.1934, 74 S.W.2d 20, 21, loc. cit. 24, where the Court held:
"In order to relieve the master of liability, the servant must, however, be engaged solely in his own business or pleasure, for if he combines the two with the master's express or implied consent, the master is yet liable. Also if the use of the car by the servant is with the master's consent, coupled with a benefit to him, the master is liable, although such use is in the immediate business or pleasure of the servant. * * *"
In Restatement of the Law, Agency, Sec. 236, we find this rule:
"Conduct Actuated by Dual Purpose

* * * * * *
"b. The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act otherwise is within the service * * *." (Emphasis added)
*593 Under plaintiff's evidence there was no substantial deviation by the driver of defendant's truck from the time the driver took the truck from defendant's parking lot to the time of the accident, but if it be urged that stopping for a meal, or at the tavern, prior to the accident was a deviation it would only, at most, be a slight deviation.
"* * * to relieve the master from liability of his servant's acts, on the ground that he has deviated from the scope of his employment, the deviation must be so substantial as to constitute an entire departure from such employment for purposes entirely personal to the servant; and, where the servant, notwithstanding the deviation, is still to some extent engaged in the master's business within the scope of his employment, it is immaterial that he also may have combined with this some private purposes of his own." Thomas v. Slavens, 8 Cir.1935, 78 F.2d 144, loc. cit. 147.
We believe the ruling in Mauzy et ux. v. J. D. Carson Co., St. Louis Court of Appeals 1945, 189 S.W.2d 829, cited in brief by both plaintiff and defendant, applies to the facts in this case. In the Carson case, loc. cit. 833, the Court summarized facts justifying an inference of agency which bear a striking resemblance to the record made in this case. In the Carson case plaintiff's evidence showed that the accident happened at a time when the driver was engaged in a personal errand in which the employer had no interest whatsoever. No such evidence appears in this case on plaintiff's part. Defendant did contradict the driver regarding instructions to take the truck and have it repaired. As to such contradictions the Court held in the Carson case, loc. cit. 833:
"* * * we are not aware of any rule of law requiring the jury to give effect to such testimony as against an inference drawn upon the probative facts in evidence. The jury had the right to disbelieve such testimony and give effect to the inference." and concluded its disposition of defendant's contention:
"However, when there is evidence, as here, upon which the jury may draw an inference they may draw it even though there be a host of witnesses who testify directly to facts contrary to or conflicting with such inference."
Viewing the record in this case as called for by the applicable rule, we conclude there was substantial evidence for the jury to find that the driver of defendant's truck was acting in the scope of his employer's business at the time of the accident which resulted in plaintiff's injuries.
II. During the testimony of Hendricks, who was defendant's superintendent, he was questioned regarding a statement of Gray, alleged to have been made at a tavern in Valley Park prior to Gray's leaving the defendant's parking lot with the tractor on the eve of the accident. Defendant's brief states his complaint as follows:
"Defendant offered to show by Superintendent Hendricks that Gray (the Chauffeur) while in the tavern at Valley Park made statements to the effect that he was returning and taking the tractor without the knowledge of the manager or the witness." (Emphasis added)
It does not appear how this statement could have been made by Gray in the presence of the witness and still show he was taking the tractor "without the knowledge of * * * the witness." But we do not find the offer would have contradicted the testimony of Gray. Gray's deposition does not reveal he was asked the direct question, if anyone had knowledge at the defendant's factory that he was taking the tractor on the occasion in question, but we think the conclusion is inevitable from his deposition that no one did have knowledge that he was taking the tractor. Gray testified that he received orders to take the tractor to the repair shop "about a week" before the date of the accident and that he had no conversation with "anybody after that until the time of the accident." Gray further testified that he didn't "say to anybody at Lock Joint" that he was going to take the tractor the evening of the accident. At the time the evidence was offered the Court was of the opinion that it was hearsay and admissible only for the purpose of impeaching Gray, and since no foundation had been *594 laid it was not admissible for that purpose. We have not changed our opinion. The case of Roth v. Continental Wire Co., St. Louis Ct. of Appeals 1902, 94 Mo.App. 236, 68 S.W. 594, 602, cited by the defendant, is not in point. In the Roth case, to collect the price of a machine, one Fitch testified to a visit to a factory for the purpose of examining the machine. Fitch testified he made the visit, examined the machine, and there pronounced the machine poorly constructed and very deficient. Fitch was not cross-examined and over objection evidence was admitted that while Fitch was at the factory examining the machine he promised that the machine would be paid for. The evidence offered contradicted Fitch's testimony and in approving its admission the Court called attention to Fitch being a chief officer "of the defendant company" and held the statement "against the interest of [his company] * * * was competent."
III. Defendant's third complaint is that the verdict is excessive. Plaintiff was 18 years old at the time of trial. Prior to the accident he was in a healthy condition, working daily. He received a brain concussion and was rendered unconscious by the collision. On regaining consciousness at the hospital he suffered pain about the head and back. His knee was swollen. He was given sedatives. Two days after the accident he developed nose bleeding. He was in the hospital ten days. He returned to work about 24 days after the accident, worked three weeks and was then off for two weeks. His nose bleeding continued, but at longer intervals. At the time of trial he was still suffering from headaches, sinus trouble, nose bleeding, and his back bothered him some. Plaintiff's doctor testified that because of the swollen condition of plaintiff's left eye and cheek a fractured cheek bone was not discovered until he left the hospital. The fracture extended into the upper part of the sinus and into the bone that forms the eye socket. This fracture caused plaintiff to suffer sinus trouble, and its duration cannot be predicted.
There is no accurate and exact way of measuring damages which will reasonably compensate for personal injuries. It is a matter peculiarly for a jury to determine. References to adjudicated cases renders little aid because the injuries in no two cases are alike. It is the law that a Court is not authorized to disturb a jury finding on the subject unless it can determine that the verdict exceeds the limits of reason and offends a sense of right. We consider the verdict in this case substantial but we cannot say it is unreasonable or the result of misconduct in view of the age of plaintiff, his previous good health, and the injuries sustained.